# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| VIRGINIA HUNT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CIVIL NO. 10-602-GPM |
| | ) |
| DAVITA, INC., | ) |
| | ) |
| Defendant. | ) |

# **MEMORANDUM AND ORDER**

**MURPHY, District Judge:**

This matter is before the Court on the motion for summary judgment brought by Defendant DaVita, Inc. ("DaVita") (Doc. 27). Plaintiff Virginia Hunt, a former DaVita employee, brings this action for retaliatory discharge under Illinois law; federal subject matter jurisdiction is premised upon diversity of citizenship pursuant to 28 U.S.C. § 1332. In January 1990 Hunt began working as a dialysis tech for Nephroplex in Benton, Illinois. In 2005 DaVita, a company that provides dialysis services and education to patients with kidney disorders, purchased Nephroplex, whereupon Hunt became a DaVita employee, working as a patient care technician and reuse technician in Benton. Hunt was an at-will employee of DaVita; she had no contract of employment with the company. On August 16, 2009, Hunt performed her last day of work for DaVita. The following day, August 17, 2009, Hunt suffered a heart attack that required her to undergo five-way bypass surgery. Effective August 17, 2009, Hunt was placed on an unpaid medical leave of absence by Kathy Velasquez, DaVita's senior disability specialist, pursuant to DaVita's Family Medical Leave Act ("FMLA") policy, whereby DaVita employees suffering from a serious medical

condition were allowed three months of unpaid leave. On September 4, 2009, Velasquez informed Hunt by letter that her leave of absence was being designated provisionally as FMLA leave and told Hunt that, if she were unable to return to work at the end of her three months of FMLA leave, she might be qualified under DaVita's non-work-related medical leave of absence ("NWMLA") policy for an additional three months of unpaid leave. The September 4 letter included a form advising Hunt that, under DaVita's NWMLA policy, a DaVita employee whose medical leave continued for more than six months (i.e., three months of FMLA leave followed by three months of leave under DaVita's NWMLA policy) would be terminated on the last day of the month in which the six months of leave were exhausted, absent a law to the contrary. On September 14, 2009, Hunt signed the form, thus affirming that she had read, understood, and agreed to the terms and conditions of her leave of absence, and returned the form to the manager of DaVita's Benton facility, Elizabeth Thompson.

Hunt exhausted her FMLA-designated leave on November 6, 2009, as she was informed by Velasquez in a letter dated January 4, 2010. Valesquez sent Hunt two additional letters, dated January 4, 2010, and the January 18, 2010, respectively, informing Hunt that she had been placed on NWMLA leave. On February 11, 2010, Velasquez sent Hunt a letter telling Hunt that her six months of leave was scheduled to end soon and that, if Hunt wanted to return to work, she should contact Thompson to see if her job was still available, as Hunt's positions with DaVita were not job-protected during the last three months of Hunt's leave. On March 3, 2010, Velasquez informed Hunt by letter that her employment with DaVita was terminated because Hunt had exhausted all leaves of absence that were available to her through DaVita and had not returned to work. Hunt's termination was effective February 28, 2010, the last day of the sixth month of Hunt's

leave of absence. Because DaVita does not consider a termination for failure to return from leave to be involuntary, Hunt was eligible to be re-hired by DaVita. When Hunt began her leave of absence on August 17, 2009, her positions of patient care technician and reuse technician were both filled by one temporary worker, who was permanently assigned to fill Hunt's positions at DaVita on August 21, 2010.

While Hunt was on her leave of absence recovering from her heart surgery, Hunt was diagnosed with carpal tunnel syndrome ("CTS"). Upon learning of this diagnosis and her doctor's recommendation for surgery, Hunt informed the administrator of DaVita's Benton facility, Thompson, that she was going to have surgery for CTS. During Hunt's first visit to the doctor who was treating her for CTS, Hunt submitted her insurance card for payment for the surgery, and it was approved. Later, after Hunt found out that the bill had not been paid by the insurance, Hunt was told by personnel at her doctor's office that her bill for the CTS surgery had been submitted to workers' compensation. Hunt had surgery for her CTS in January 2010. On March 19, 2010, Hunt filed a workers' compensation claim against DaVita in connection with her CTS.[1] On May 5, 2010, Hunt was medically released to return to work. In August 2010 Hunt filed this action, alleging that she had been terminated by DaVita for bringing a workers' compensation claim for her CTS. The case was filed originally in the Circuit Court of the Second Judicial Circuit, Franklin County, Illinois, and comes before this Court on removal. At this time DaVita seeks summary judgment on Hunt's retaliatory discharge claim. The summary judgment motion has been fully briefed, and the Court rules as follows.

---

1. It appears that Hunt filed a second workers' compensation claim against DaVita on June 8, 2010. That claim is not at issue in this case.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, generally at any time until thirty days after the close of discovery in a case, "[a] party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). The rule provides further that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." *Id*. Under Rule 56, "[a] party asserting that a fact cannot be . . . genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the . . . presence of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1)(A)-(B). The rule provides also that "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). With respect to affidavits and declarations, the rule provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In responding to a summary judgment motion, the non-moving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show a genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Johnson v. City of Fort Wayne, Ind*., 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of some alleged factual dispute between the parties or by some metaphysical doubt as to the material facts. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact

exists only if a fair-minded jury could return a verdict for the nonmoving party on the evidence presented. *See Anderson*, 477 U.S. at 252; *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). In considering a summary judgment motion, a court must draw all reasonable inferences in the light most favorable to the non-moving party. *See Miller v. Herman*, 600 F.3d 726, 733 (7th Cir. 2010). On summary judgment a court may not make credibility determinations or weigh the evidence, because these are tasks for a factfinder. *See Morfin v. City of E. Chicago*, 349 F.3d 989, 999 (7th Cir. 2003). In evaluating a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Under Illinois law, "[i]n general, an employer may terminate an at-will employee for any reason or even for no reason at all." *Sweat v. Peabody Coal Co.*, 94 F.3d 301, 304 (7th Cir. 1996). *See also Barr v. Kelso-Burnett Co.*, 478 N.E.2d 1354, 1356 (Ill. 1985); *Robinson v. BDO Seidman, LLP*, 854 N.E.2d 767, 770 (Ill. App. Ct. 2006). However, Illinois recognizes an exception to the at-will employment doctrine for cases of retaliatory discharge. To make out a claim for retaliatory discharge under Illinois law, an employee must demonstrate (1) that the employee has been discharged; (2) that the discharge was in retaliation for the employee's activities; and (3) that the discharge violates a clear mandate of public policy. *See Hartlein v. Illinois Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992). The Supreme Court of Illinois has determined that a discharge in retaliation for an employee's exercise of workers' compensation rights violates the public policy of the State of Illinois. *See Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 357-58 (Ill. 1978). To show retaliatory discharge for the exercise of workers' compensation rights, a plaintiff must establish that:

(1) he or she was an employee of a defendant before being injured; (2) he or she exercised a right granted by Illinois workers' compensation law; and (3) there was a causal connection between the plaintiff's workers' compensation claim and the plaintiff's discharge. *See Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir. 2001); *Groark v. Thorleif Larsen & Son, Inc.*, 596 N.E.2d 78, 81 (Ill. App. Ct. 1992). The element of causation is not met if the employer has a valid, non-pretextual basis for discharging the employee. *See Bourbon v. Kmart Corp.*, 223 F.3d 469, 473 (7th Cir. 2000); *Slover v. Brown*, 488 N.E.2d 1103, 1105 (Ill. App. Ct. 1986). Thus, an employee's claim fails if the employer articulates a legitimate, non-discriminatory reason for the termination and the employee fails to provide evidence that the proffered reason is pretextual. *See Gomez v. The Finishing Co.*, 861 N.E.2d 189, 197-98 (Ill. App. Ct. 2006) ("If the employer is able to articulate a legitimate, nondiscriminatory reason for the employee's discharge, then the plaintiff has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not true, but a pretext for discrimination."). "The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered reason is pretextual." *Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997). *See also Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000) ("A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks."). Retaliatory discharge exists not only where an employee is fired for filing a workers' compensation claim, but also where the employee is preemptively fired to prevent the filing of a claim. *See Richardson v. Illinois Bell Tel. Co.*, 510 N.E.2d 134, 136-37 (Ill. App. Ct. 1987); *Wolcowicz v. Intercraft Indus. Corp.*, 478 N.E.2d 1039, 1042 (Ill. App. Ct. 1985).

As an initial matter, the Court notes that there is virtually no evidence of record that Hunt ever told anyone at DaVita that she had exercised or intended to exercise her workers' compensation rights under Illinois law with respect to her CTS. Hunt has given an affidavit in which she states that "[p]rior to August of 2009, I had conversations with Beth Thompson and other coworkers on numerous occasions regarding the numbness and tingling in my hands. Beth Thompson knew that I had numbness and tingling in my hands and knew that I believed its cause was work-related." Doc. 38-7 at 1 ¶ 2. At her deposition, however, Hunt testified only that at an unspecified time she had told Thompson "that I was going to have my carpal tunnel taken care of," and that she expected Thompson to draw from this statement "an implied assumption" that Hunt considered her CTS work-related. Doc. 28-1 at 26. It is well settled, of course, that a party cannot prevail on a motion for summary judgment by "submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony." *Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir. 1998) (quoting *Diliberti v. United States*, 817 F.2d 1259, 1263 (7th Cir. 1987)). Thus, "[w]here deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken.[.]" *Id*. (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995)). This is because affidavits "when offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy." *Beckel v. Wal-Mart Assocs., Inc*., 301 F.3d 621, 623 (7th Cir. 2002). Moreover, this explanation must be offered in the affidavit itself. *See, e.g., Babrocky v. Jewel Food Co*., 773 F.2d 857, 861-62 (7th Cir. 1985); *Miller v. A.H. Robins Co*., 766 F.2d 1102, 1104-05 (7th Cir. 1985). Here Hunt's affidavit contains no explanation of the discrepancy between what she testified to telling

Thompson about her CTS in her deposition and what she claims Thompson knew about Hunt's CTS in the affidavit.[2]

Still more to the point, there is no evidence that the decision-maker responsible for Hunt's termination had any notice that Hunt had exercised or intended to exercise her workers' compensation rights under Illinois law until after Hunt was terminated. It is "essential" for a plaintiff asserting retaliatory discharge under Illinois law to establish that those responsible for firing him or her knew about the plaintiff's workers' compensation claim. *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 769 n.7 (7th Cir. 1994) (citing *Marin v. American Meat Packing Co.*, 562 N.E.2d 282, 286 (Ill. App. Ct. 1990)) ("Evidence that those responsible for an employee's termination knew that he intended to file, or, as in this case had filed, a workers' compensation claim is essential to a retaliatory discharge action under Illinois law."). In this instance it is undisputed that Velasquez, as DaVita's senior disability specialist, had the sole responsibility for overseeing, managing, and making all decisions with respect to Hunt's unpaid medical leave of absence. It likewise is undisputed that Velasquez, whose office is in Denver, Colorado, has never visited DaVita's facility in Benton and has never met Hunt or talked to her on the telephone. According to Velasquez's uncontradicted affidavit in support of summary judgment, she did not consult with anyone about making the decision to terminate Hunt's employment. *See* Doc. 28-2 at 4 ¶ 25. Velasquez attests further that she

> did not receive or otherwise know any information from anyone about the specific circumstances of Ms. Hunt's employment history, why she was on a medical leave of absence, what conversations she may have had with anyone else at DaVita about

---

2. This perhaps is the place to point out that at her deposition Hunt testified that she knew that DaVita used a "Teammate Incident Report" form for employees to report workplace injuries, but she never completed such a form with respect to her CTS. *See* Doc. 28-1 at 8.

her medical condition, whether she had or had not suffered a work-related injury, or whether she had any plans for seeking benefits under the Illinois Workers' Compensation Act.

*Id*. ¶ 26. According to Velasquez, her decision to terminate Hunt's employment was caused solely by "the fact that [Hunt] had exhausted all six months of the leave allowed" under DaVita's FMLA and NWMLA policies. *Id*. ¶ 27. Velasquez first learned that Hunt needed to be put on medical leave when she received a notice from Hewitt/LCG ("Hewitt"), the company DaVita contracted with at the time to provide its employees disability benefits, that Hewitt was processing an application by Hunt for short-term disability ("STD") benefits. Velasquez knew that Hewitt specifically asked applicants for benefits at the initial application stage if the medical condition necessitating benefits was "work related" and knew that if the answer was "yes," then Hewitt would not process an application for benefits. *Id*. at 5 ¶ 30. Thus, according to Velasquez, when she received notice from Hewitt that the company was processing an application for STD benefits for Hunt, Velasquez assumed that Hunt had told Hewitt as part of her application for the benefits that the reason for her medical condition was not work-related. Similarly, when Velasquez learned on January 2, 2010, that Hunt had been approved by Hewitt for disability benefits, Velasquez, due to her familiarity with the procedure followed by Hewitt to approve benefits for applicants, knew that Hunt's doctor must have confirmed to Hewitt that Hunt's medical condition was not work-related. In sum, there is no evidence of record suggesting that, prior to March 3, 2010, when Velasquez informed Hunt by letter that she had been terminated, Velasquez had any notice that Hunt believed she had a workers' compensation claim. Hunt admitted at her deposition that it is "pretty obvious" that DaVita first learned of Hunt's workers' compensation claim after Hunt was terminated, when DaVita received a copy of the claim. Doc. 28-1 at 8.

Hunt argues that she has met her burden of showing pretext because DaVita's policy of terminating employees for failing to return from leave has a disparate impact on DaVita employees who suffer work-related injuries. The Court finds this argument meritless, for numerous reasons. First, it is well settled that "[u]nder Illinois law, a plaintiff's inability to perform his job is a valid nonpretextual reason to terminate him[.]" *Cochrum v. Old Ben Coal Co.*, 678 N.E.2d 1093, 1099 (Ill. App. Ct. 1997). The United States Court of Appeals for the Seventh Circuit specifically has upheld the legality of policies mandating termination of employees who fail to return from leave similar to DaVita's policy. *See Dotson v. BRP U.S., Inc.*, 520 F.3d 703, 707-10 (7th Cir. 2008) (holding that an employee was validly terminated pursuant to an employer's policy of automatically terminating employees who failed to return from three months' FMLA leave). In *Dotson*, the court ruled that an employer's policy under which an employee is terminated automatically for failing to return from leave is valid, provided the employee has notice of the policy and the policy is applied even-handedly to all employees. *See id*. at 709-10. Here it is undisputed that Hunt had notice of DaVita's policy; as noted, on September 14, 2009, Hunt signed a "terms and conditions" acknowledgment after her leave commenced in which she acknowledged that a DaVita employee who does not return from medical leave at the end of six months will be terminated. It also is clear that the policy is applied even-handedly: between January 1, 2009, and March 3, 2010, when Hunt was terminated, DaVita terminated 344 employees for failing to return from leave. Second, the Court is not particularly concerned with the legality of DaVita's policy, given that the relevant question is whether DaVita believes its stated reason for terminating Hunt. *See Clemons v. Mechanical Devices Co*., 704 N.E.2d 403, 407 (Ill. 1998) ("The alleged illegality of defendant's explanation for plaintiff's discharge is not relevant here and does [not] preclude the employer from

offering that reason as a defense to plaintiff's cause of action."). Third, there is no evidence that DaVita's policy of terminating employees who fail to return from leave falls unduly harshly on employees who have suffered work-related injuries. Finally, Hunt's argument is ridiculous in light of the fact that DaVita employees terminated for failure to return from leave are eligible for rehire after termination. In this case the undisputed evidence is that Hunt was eligible for rehire after she was terminated and for a significant period of time after her termination would have been rehired if she had applied and been able to perform her previously-held job. Thompson, the administrator of the DaVita facility in Benton where Hunt worked, has given an uncontradicted affidavit stating that: she was responsible for hiring employees to fill positions at the Benton facility; from the time Hunt started her leave of absence until about August 21, 2010, there was a temporary worker filling Hunt's's positions; and Thompson knew Hunt's termination had been with eligible-for-rehire rights and knew as of April 5, 2010, that Hunt had filed a workers' compensation claim against DaVita. *See* Doc. 28-3 at 1-2 ¶¶ 1-7. Thus, until August 21, 2010, when a new permanent employee was installed in the positions that Hunt had held, the fact that Hunt had filed a workers' compensation claim would not have prevented her from returning to work for DaVita in the positions she had previously held. Moreover, even after August 21, 2010, when a new permanent employee was installed in Hunt's former positions, Thompson would have given Hunt first priority for any open position at DaVita's Benton facility for which Hunt might apply and for which Hunt otherwise was qualified, notwithstanding Hunt's workers' compensation claim against DaVita. *See id*. at 2 ¶ 9. In fact, Hunt testified that she believed DaVita would have rehired her in late May 2010 or early June 2010. *See* Doc. 28-1 at 13. The Court concludes that no rational jury could find for Hunt on her retaliatory discharge claim.

To conclude, DaVita's motion for summary judgment (Doc. 27) is **GRANTED**. This action is **DISMISSED with prejudice**. The Clerk of Court will enter judgment accordingly.

**IT IS SO ORDERED.**

DATED: June 24, 2011

/s/ G. Patrick Murphy
G. PATRICK MURPHY
United States District Judge